Argued September 6, reversed and remanded August 13, 1952

# VALLEY & SILETZ RAILROAD CO. *v.* FLAGG, RESP., WESTERN LOGGING CO. and LEADBET-TER LOGGING & LUMBER CO., INTERVENERS

247 P. 2d 639

684

*Fletcher Rockwood,* of Portland, argued the cause for appellant. On the brief were Hart, Spencer, McCulloch, Rockwood and Davies, of Portland.

*Wallace G. Mills,* Assistant Attorney General, of Salem, argued the cause for respondent. With him on the brief was George Neuner, Attorney General.

*Dean Ellis,* of Portland, argued the cause for interveners. On the brief were Ellis and Ellis, of Portland.

ROSSMAN, J.

This is an appeal by Valley & Siletz Railroad Company from a decree of the circuit court which affirmed an order entitled No. 25218 entered July 7, 1950, by George H. Flagg, Public Utilities Commissioner. Order No. 25218 prescribed rates for intrastate log shipments on the line of the appellant railroad. The appellant claims that the rate is confiscatory and will result in an annual loss of revenue by it of $25,000. The respondents are three in number. One is the Public Utilities Commissioner, who, at the time of the appeal, was Mr. George H. Flagg, but who now is Mr. Charles H. Heltzel. The second and third respondents entered the case as interveners. They are Western Logging Company and Leadbetter Logging & Lumber Company. The three have joined in the brief submitted to this court.

The appellant's railroad is 41 miles long and extends from a connection with the Southern Pacific Company at Independence westerly to Valsetz. The latter, which is at the summit of the Coast Range of mountains, is the site of a large lumber manufacturing

plant. The appellant is a common carrier and its entire line is in this state. In *Valley & Siletz Railroad Company v. Thomas,* 151 Or 80, 95, 48 P2d 358, 364, Mr. Justice BAILEY gave a description of the road.

Upon the Willamette river, at a point near Independence, is a log dump which the Western Logging Company owns and operates. It is served by a spur of the Valley & Siletz Railroad.

The appellant is owned by the same corporation which owns the lumber manufacturing plant in Valsetz. Lumber produced in that plant is shipped out of this state and travels its first 41 miles upon the tracks of the appellant.

In the vicinity of Valsetz is a very large stand of timber much of which, as felled, moves out as logs or lumber upon the appellant's line.

In addition to the mill at Valsetz which we have mentioned, other, but smaller, mills are located along the appellant's line. Much of the lumber manufactured in them and some of the logs produced in the area contiguous to the railroad are shipped upon it. The mainstay of the return movement is the equipment and supplies required by the mills and logging operations which we have mentioned. The appellant runs over its tracks daily a motor-driven car which carries passengers, mail and express.

The intervener, Leadbetter Logging & Lumber Company, owns timber in the vicinity of Valsetz. At the time of the hearing before the commissioner, and likewise at the time of the trial in the circuit court, that concern was not a shipper upon the appellant's road, but indicated that it might become one if attractive rates were offered. It is the present owner of the properties which were owned by Charles K. Spaulding Logging Company when *Valley & Siletz*

*Railroad Company v. Thomas,* supra, was decided and which are described in the opinion filed in that case. During the times covered by the record Leadbetter logs were not moving to the Spaulding mill, to which reference is made in the decision just mentioned, but were taken to other mills owned by Leadbetter. The logs moved in part by motor truck and in part upon the surface of streams.

In 1943, or prior thereto, the Western Logging Company, to which we shall hereafter refer as Western, became the contract purchaser of a large quantity of timber which stands in the Valsetz region. Western's purpose was to convert the timber into logs and sell the latter in the available market. The appellant's line is the most practical means of reaching the market with logs produced from the timber which Western purchased.

Before Western began its logging operations it applied to the appellant for a rate governing shipments from Valsetz to Independence, and in response appellant published the tariff which underlies this suit. The latter exacted $2.55 per thousand board feet for movements between the two places, provided Western shipped not less than 35 cars daily. The tariff accepted 7,000 board feet as minimum for a car's load. In the event less than 35 cars were shipped daily, when averaged in three-months periods of time, the applicable rate was $3.08 per thousand board feet. The rate required the shipper to furnish the cars.

Although the rate which the appellant announced was unsatisfactory to Western, it nevertheless began to ship logs and before long its logging operations attained their expected capacity.

We shall now take notice of the character of the appellant's traffic. Its mail, express and passenger

business is negligible. Likewise, the return movement of freight, that is, from Independence westward is unimportant. As one can readily infer, logs and lumber are the major commodities that the line hauls. An important difference exists between the log and the lumber traffic: few of the logs are shipped outside the state, but virtually all of the lumber is destined to points in other states. In the period 1944 to 1949, both inclusive, only 2.02% of the carrier's total traffic, when expressed in terms of carloads, consisted of intrastate items other than logs and lumber. In addition, there was 0.40% interstate items other than logs and lumber, making a total of 2.42% exclusive of logs and lumber.

In the period 1944 to 1949, both inclusive, only 0.44% of the appellant's total traffic consisted of logs carried in interstate commerce. Upon the other hand, only 0.84% of its total traffic was made up of lumber carried in intrastate movement. In the period just indicated, the carrier's traffic, expressed in terms of carload units, consisted of:

76.72% logs—76.28% intrastate; 0.44% interstate;

20.86% lumber—0.84% intrastate; 20.02% interstate;

2.42%—all others.

In 1944 to 1949, both inclusive, 98.91% of the appellant's total log traffic was composed of intrastate logs and 97.84% of the lumber carried by it moved in interstate commerce.

As just indicated, virtually all of the lumber moved by the appellant goes out of this state. Referring to it, the commissioner's findings state:

"The income received from hauling lumber is derived by using a through rate from Valsetz to

the point of destination; for instance, Valsetz to Chicago or Valsetz to San Francisco. The Valley & Siletz Railroad receives a division of those rates through agreement with other carriers involved in the through movement. This division is a matter of contract between the carriers over which the commissioner has no jurisdiction or control.''

We set forth the above facts because they bear upon the extent of the Public Utilities Commissioner's jurisdiction over the rates and traffic of the carrier. Logs, as we have seen, constituted 76.72% of the total traffic and 98.91% of that traffic was intrastate. Lumber constituted 20.86% of the total traffic, but 97.84% of the lumber moved interstate.

December 18, 1944, Western and Charles K. Spaulding Logging Company [now, through change of name, Leadbetter Logging & Lumber Company] instituted a proceeding before the commissioner which attacked as unreasonable the tariff which the appellant had published. In addition to asking that it be decreed invalid, they prayed for reparations extending back to 1943. While the matter was pending before the commissioner, rate increases became effective January 1, 1947, October 13, 1947, and January 26, 1948, with the result that the rate became $3.67 per thousand board feet for multiple car shipments [35 cars daily] and $4.44 for single cars. The three rate increases paralleled general increases granted by the Interstate Commerce Commission. July 22, 1949, the commissioner entered an order, identified as No. 22422, which adjudged that the tariff employed by the appellant was unreasonable. It ordered reparations, but, since that phase of the order is not the subject of specific attack, we need not pause upon it. Order No. 22422 prescribed rates, not only for the future, but also for

the period running back to September 1, 1943. The order reduced the 35-car requirement to 25 cars and granted the shipper an allowance of 22 cents per thousand board feet as compensation if it provided the car. Other revisions made by the commissioner's order to the carrier's tariff are virtually the same as those accomplished by Order No. 25218, which we will presently summarize.

Upon promulgation of the commissioner's rate, the appellant availed itself of the procedure offered by § 112-4119, OCLA, and filed a complaint which challenged the commissioner's rate as confiscatory. Thus, was begun the suit under review. Presently Western and Leadbetter intervened in the suit with a pleading which sought a rate even lower than the one presented by Order No. 22422.

May 15, 1950, the circuit court began the trial of the issues in the suit just mentioned. Although a large volume of evidence was received during the hearing over which the commissioner presided, testimony was taken in the circuit court which, as transcribed, covers 725 pages; in addition, the parties presented to the court a wealth of data in the form of maps, summaries, analyses, studies and comparisons. The statistical material just mentioned represented the work of H. O. Berger and H. G. Butler. The trial in the circuit court concluded May 24, 1950. Obedient to the requirements of § 112-4121, OCLA, the court certified the additional evidence to the commissioner and July 7, 1950, that official substituted for Order No. 22422 Order No. 25218. That having been done, the suit proceeded in the court in the manner authorized by § 112-4121, resulting in a decree which sustained Order No. 25218.

The rate prescribed by the commissioner's Order No. 25218 is indicated by the following:

Rates Applicable from September 1, 1943 to June 30, 1946

| | Rate (Per MBM) | Minimum |
|---|---|---|
| Multiple car rate, Valsetz to Independence or dump | $2.55* | 7 MBM |
| Single car rate, shipper to furnish cars, Valsetz to Independence or dump | 3.08 | 7 MBM |
| Single car rate, carrier furnishing cars, Valsetz to Independence or dump | 3.28 | 7 MBM |

Rates Applicable from July 1, 1946 to August 31, 1950

| | Rate (Per MBM) | Minimum |
|---|---|---|
| Multiple car rate, Valsetz to Independence or dump | $3.06* | 7 MBM |
| Single car rate, shipper to furnish cars, Valsetz to Independence or dump | 3.70 | 7 MBM |
| Single car rate, carrier furnishing cars, Valsetz to Independence or dump | 3.94 | 7 MBM |

Rates Applicable on and after September 1, 1950

| | Rates Per Car |
|---|---|
| Multiple car rate, Valsetz to Independence or dump | $22.50 |
| Single car rate, shipper to furnish cars, Valsetz to Independence or dump | 26.75 |
| Single car rate, carrier furnishing cars, Valsetz to Independence or dump | 28.50 |

The appellant does not challenge the validity of the part of the order which reduced to 25 the daily shipments of 35 cars.

*Shipper must furnish the cars and ship an average of 25 cars daily.

The effect upon the revenue of the appellant which would be caused by a substitution of the commissioner's rate for that of the appellant is indicated by the following table which we have taken from the appellant's brief:

| | Revenue Under Appellant's Tariff | Revenue Under Commissioner's Prescribed Rates | Reduction |
|---|---|---|---|
| 1944 | $217,214 | $209,663 | $ 7,551 |
| 1945 | 202,184 | 184,882 | 17,302 |
| 1946 | 210,953 | 195,244 | 15,709 |
| 1947 | 257,135 | 219,383 | 37,752 |
| 1948 | 234,732 | 166,442 | 68,290 |
| 1949 | 225,034 | 160,839 | 64,195 |

The respondents' brief [commissioner's and two interveners'] without challenging those figures, breaks them down into the following compilation:

| | Reduction due to Change in Multiple Car Requirements | Reduction due to Change in Rates |
|---|---|---|
| 1944 | $ 7,551 | |
| 1945 | 17,302 | |
| 1946 | 15,709 | |
| 1947 | 33,510 | $ 4,242 |
| 1948 | 36,137 | 32,153 |
| 1949 | 32,132 | 32,063 |
| Totals | $142,341 | $68,458 |

After the respondents' brief made the compilation just quoted, it directed attention to the fact that the totals do not reflect the entire truth. It pointed out that the commissioner's rate for 1946 "increased revenues by $15,410 through increasing the tariff rates, and reduced revenues by $31,811 by changing the mul-

tiple car requirement." Giving effect to the adjustments just made, we have the following:

| | Reduction Due To Change in Multiple Car Requirements | Reduction Due To Change in Rates |
|---|---|---|
| Total, above | $142,341 | $68,458 |
| Subtract | (15,709) | (15,410) |
| Add | 31,811 | |
| True totals | $158,443 | $53,048 |

Thus, the total adverse effect of the commissioner's rate upon the appellant's revenue in the period to which our data is applicable is $211,491 ($158,443 plus $53,048). That amount is, of course, greater than the total of $142,341 plus $68,458. The difference is due to the fact that the appellant inadvertently omitted one shipment of logs totaling $692.00. The adverse effect would be $35,248 annually.

The above, as we have seen, covers the years 1944 through September 1, 1950. For the period beginning September 1, 1950, the challenged order prescribed rates on a basis of carloads, graduated as follows:

| | Rate Per Car |
|---|---|
| Under 8,000 | $22.50 |
| 8,000 to 9,000 | 24.75 |
| 9,000 to 10,000 | 27.00 |
| 10,000 to 11,000 | 29.25 |
| 11,000 to 12,000 | 31.50 |
| 12,000 to 13,000 | 33.75 |
| Over 13,000 | 39.38 |

The effect of the per-car rate upon the carrier's revenue is indicated by resort to the following data:

| | 1944 | 1945 | 1946 | 1947 | 1948 | 1949 |
|---|---|---|---|---|---|---|
| 1. Revenue accrued under published tariffs | $217,214 | $202,184 | $210,953 | $257,135 | $234,732 | $225,034 |
| 2. Total carloads of logs shipped by Western from Valsetz to Independence | 10,176 | 8,488 | 7,916 | 8,767 | 7,228 | 6,874 |
| 3. Total M.B.M. shipped by Western from Valsetz to Independence | 81,275 | 72,513 | 70,254 | 71,679 | 53,906 | 51,225 |
| 4. Revenue per carload—Line 1 divided by Line 2 | $ 21.35 | $ 23.82 | $ 26.65 | $ 29.33 | $ 32.48 | $ 32.74 |
| 5. Load per car—Line 3 divided by Line 2 | 7,900 | 8,500 | 8,900 | 8,100 | 7,400 | 7,400 |

The foregoing shows that in 1944 the carrier received $21.35 per car [7,900 on each car] but the commissioner's rate, had it been effective in that year, would have yielded $22.50 per car. In 1945 the carrier received $23.82 [8,500 feet per car]. The commissioner's rate would have given it $24.75 per car. In 1946 the carrier received $26.65 per car [8,900 feet per car] but the commissioner's rate would have produced only $24.75 per car. In 1947 when the carrier received $29.33 per car [8,100 feet] the prescribed rate would have given it $24.75 per car. In 1948 the carrier received $32.48 [7,400 feet] but the commissioner's rate would have granted it only $22.50 per car. In 1949 the carrier receved $32.74 per car [7,400 feet] but the commissioner's rate would have given it $22.50 per car. The above indicates that if the commissioner's rate had been in effect in 1944 through 1949, the appellant would have received slightly larger returns in 1944 and 1945 but materially smaller revenue in 1946 and from then on.

It is altogether possible that, since the entry in line 4 of the foregoing table was obtained by resort to average loads per car, it may not be precisely accurate. But we believe that the entries in that line sufficiently approach accuracy to indicate the effect upon the appellant's revenue of the prescribed rate.

As we have said, the order of the commissioner which is under attack granted reparations and prescribed $22.50 per car as the future rate. It is evident from the data just reviewed that the prescribed rate, if valid, will reduce to a material extent the appellant's revenue. The prescribed rate deems the line's tariff as excessive for all past years except 1944 and 1945. It prescribes a rate for the future substantially lower than the one which the carrier charged in the past. The

figures of which we have taken notice show that if the commissioner's rate had been in effect in 1944 through 1949, the appellant would have received an average of $35,248 less revenue in each of those years. In 1949 it received an average return of $32.74 per car [7,400 feet per car] but beginning September 1, 1950, the commissioner's rate calls for only $22.50 per car [load under 8,000 feet].

■ Although the rate promulgated by the commissioner will affect the appellant's revenue in a manner adverse to it, the issues submitted by this case are not resolved by making that statement. We are required to go on and determine whether or not the rate is so low that it is, in fact, confiscatory.

The complaint, in addition to alleging confiscation, makes other charges of invalidity. Many paragraphs of the complaint are devoted to the charge of confiscation; in fact, the Paleozoic layer of this case is a basic averment of confiscation. The essence of that averment is indicated by the following which we take from the complaint:

> "Said order * * * would compel plaintiff to render service as a common carrier by railroad in intrastate commerce at rates and under rules and regulations which would make it impossible for plaintiff to earn a fair return on its property devoted to intrastate commerce, would result in confiscation of plaintiff's property, and would deprive plaintiff of its property without due process of law. * * * The difference between the present rates and the rates prescribed by said order would in terms of loss of revenue to plaintiff amount to not less than $25,000 per year from and after November 10, 1949, and during each subsequent year, * * *."

■ The record contains an impressive amount of evidence upon the subject of confiscation, but before we

give it attention we shall take notice of the following holding in *Federal Power Commission v. Hope Natural Gas Co.,* 320 US 591, 88 L Ed 333, 64 S Ct 281 that it is the end result of an order of a regulatory authority which determines the question of its validity and not the processes by which the authority reached the result.

Referring to the manifest wisdom of that rule, the appellant's brief says:

> "We concede that if the rates prescribed by the Commissioner are not confiscatory, the order and the decree affirming it should be affirmed, however fallacious may be the methods by which the Commissioner reached his conclusion, but if the end result is confiscation, the order and the decree must be reversed."

It is, therefore, our duty to turn to the evidence which the parties presented upon the charge of confiscation.

The evidence can be classified into three main divisions: (1) that which has a tendency to indicate the longevity of the railroad and the percentage of the line's net value which should be assessed annually against the traffic by way of amortization of the investment; (2) that which suggests the amount of the appellant's annual indirect costs which should be charged against the log traffic; and (3) the amount of net revenue which the appellant will have if the prescribed rate is deemed valid.

In all likelihood, the term "indirect costs" includes such items as an amortization charge, but since the parties have considered amortization separately, we will, for present purposes, follow their course. When we employ the term "direct costs" we mean the actual or out-of-pocket expense which a carrier incurs when it moves a car from one point on its line to another. Direct costs, as we shall use the term, do not

include items of such a constant nature as real estate taxes nor other expenses which a carrier incurs whether or not it moves any traffic. Indirect costs, upon the other hand, include all expenses which are constant and which do not vary with traffic.

■ Evidence pertaining to the life of the railroad was material because the commissioner permits the appellant to recover in annual amortization charges its investment in the parts of the railroad which are not subject to normal depreciation. The roadbed, for example, is not subject to depreciation and, hence, we assume that the appellant's investment in it is recovered through the authorized amortization charge. A locomotive, upon the other hand, is expendable and, therefore, unless we misconstrue the record, the investment in it is recovered through depreciation charges. The reason why this railroad, unlike the trans-continental systems, is permitted to amortize its investment is because the commissioner believes that it will not prove to be never-ending in its usefulness, but, to the contrary, will be comparatively short-lived. It is assumed that when the timber in the Valsetz area has been felled, the line will have no further traffic and no value except possibly as junk. See *Hammond Lumber Co. v. Public Service Com.*, 96 Or 595, 189 P 639, 9 ALR 1223. Although the commissioner and the appellant subscribe to that belief, the parties disagreed as to the number of years that will pass before the timber has been exhausted. After a sizeable quantity of evidence had been submitted upon that issue, the commissioner entered a finding that the timber will provide the line with traffic for 25 years, beginning January 1, 1947. The appellant has accepted that finding. The parties are in agreement as to the amount of the appellant's investment in its

property and, hence, the total of each year's amortization charge can be determined with approximate accuracy; but the parties are in serious disagreement as to how much of that annual total should be assessed against the log traffic.

The disagreement as to distribution between the log traffic and all other movements of the amortization charge extends also to the distribution of return upon the investment and all other charges that enter into total indirect costs.

■ Since logs and lumber are the only commodities of importance which the appellant carries, the issue of distribution is virtually one as to how much of the appellant's indirect costs (including return and amortization) should be assigned to the log traffic and how much to the lumber. But the lumber which the appellant moves, unlike the logs, is largely interstate in character and, hence, efforts to redistribute the appellant's indirect costs and allocate a larger amount of them to the lumber traffic is tantamount to an undertaking to relieve intrastate commerce of a burden and impose it upon interstate movements. We do not mean to indicate that redistribution between intrastate and interstate traffic cannot be made when justice warrants the action, but we have in mind the peculiar character of the difficulties which arise from the limited jurisdiction of the commissioner's office. The following is quoted from *Texas & Pacific Railway Co. v. United States*, 234 US 342, 34 S Ct 833, 58 L Ed 1341:

> "* * * The fact that carriers are instruments of intrastate commerce, as well as of interstate commerce, does not derogate from the complete and paramount authority of Congress over the latter, or preclude the Federal power from being exerted to prevent the intrastate operations of such car-

riers from being made a means of injury to that which has been confided to Federal care. Wherever the interstate and intrastate transactions of carriers are so related that the government of the one involves the control of the other, it is Congress, and not the state, that is entitled to prescribe the final and dominant rule, for otherwise Congress would be denied the exercise of its constitutional authority, and the state, and not the nation, would be supreme within the national field.''

American Jurisprudence, Vol. 9, § 142, states:

''Where the business of the carrier is both interstate and intrastate, the question whether a scheme of maximum rates fixed by the state for intrastate transportation affords a fair return must be determined by considering separately the value of the property employed in the intrastate business and the compensation allowed in that business under the rates prescribed. In determining the fair value of property used in interstate and intrastate traffic, respectively, some authorities have made apportionment on the basis of the gross revenue derived from the two classes of business. This has been said to constitute a division according to the 'value of the use.' The relation of expense to revenue is not, however, necessarily or ordinarily the same for both classes of business so that a division of the value of the property of an interstate carrier, according to gross earnings derived respectively from its interstate and intrastate traffic, does not ordinarily give an accurate measure of the value of the use of property in the intrastate business. Therefore, it would seem to be necessary to find a basis for a division of the total value of the property independently of revenue, and this must be found in the use that is made of the property. That is, there should be assigned to each business that proportion of the total value of the property which will correspond to the extent of its employment in that business.''

One can readily see that a problem of rate making, which at the outset appears to be most perplexing, begins to melt away when a division of the carrier's property into its interstate and intrastate phases has been made. As we shall presently show, no such division preceded the entry of attacked Order No. 25218.

In discussing the issues under review, we make no intimation that a carrier is entitled to a uniform return upon all the commodities it carries. The respondents' brief says:

"The parties are in agreement that these direct costs form the floor below which the rate level should not be set",

and the appellant declares:

"The power of a regulatory authority to spread the burden follows from the principle stated in Banton v. Belt Line Railway Co., 268 US 412, 45 S Ct 534, that the carrier has 'no constitutional right to the same rate or percentage of return on all its business.' "

The instant case presents the unique feature that the logs shipped by the intervener, Western, constitute virtually the only commodity carried by the appellant over which the commissioner has power to regulate rates.

The parties presented much evidence upon the subject of the distribution of indirect costs. The aforementioned H. G. Butler, as a witness for the appellant, prepared for the avail of the record studies upon the subject. He submitted that distribution of the indirect costs should follow the ratio that the direct cost of moving logs bears to the direct cost of moving lumber. There is no dispute between the parties as to the direct cost of moving lumber from Valsetz to Independence.

H. O. Berger, on behalf of the interveners, prepared studies upon the same subject and maintained that indirect costs should be allocated between logs and lumber upon the basis of one to three.

■■■ The record indicates clearly that a serious issue pended between the parties throughout the hearing before the commissioner and during the trial in the circuit court upon the subject of the distribution of indirect costs. It was impossible to know how much the log rate should be until the allocation was made and, likewise, until there had been assigned to the log and the lumber movements their respective amounts of the indirect costs, no determination could be made as to whether or not the rate which was presently prescribed was confiscatory. No authority has been called to our attention which holds that the function of allocating indirect costs is judicial in nature. As nearly as we can discern from the record, distribution among the commodities transported by a carrier is determined in part by policy, past experience, the necessity of meeting competition and similar practical considerations. Those determining factors vary in their ultimate effect, not only among the many carriers, but also with commodities and in the different geographical sections of the country. Rate making is universally deemed legislative in character. In *St. Joseph Stockyards Co. v. United States,* 298 US 38, 56 S Ct 720, 80 L Ed 1033, Mr. Chief Justice Hughes said: "The fixing of rates is a legislative act." Although the making of rates is legislative in nature, the order of a rate-regulating authority which prescribed a rate is subject to judicial review. Clearly, the distribution of the indirect costs between the commodities which the appellant carries was the duty of the commissioner. See 13 CJS, Carriers, p 665, § 290. After it had been made, judicial

review was available incidental to the review of the validity of the rate order.

The above indicates that although a charge of confiscation ushered in this suit, the presentation of the evidence quickly revealed that the charge was dependent upon two issues of an underlying character: (1) the segregation of the carrier's property and revenue into their interstate and intrastate divisions, and (2) the distribution of indirect costs between the log traffic and all others.

The findings of fact entered by the commissioner do not segregate the appellant's property and revenues into their interstate and intrastate aspects, nor do they declare that the issues of which we have taken notice can be solved without segregation. When we said in a preceding paragraph that the prescribed rate, had it been in effect in 1944 through 1949, would have yielded $35,248 less revenue per year than the carrier's tariff, we had reference to total revenues. The findings entered by the commissioner attempt segregation of neither property nor revenue. Likewise, they do not set forth any rule governing the allocation of indirect costs and do not show how the commissioner made his allocation.

■ The trial judge prepared a memo opinion from which we take, with approval, this statment:

"The Commissioner in his findings of fact and conclusions of law has made no attempt to segregate the cost of rendering the intrastate business of the plaintiff from the cost of rendering its interstate business. * * * In Simpson v. Shepard, 230 U.S. 352, the Supreme Court of the United States sets forth the limitations upon the power of a state court in the following language:

" 'Where the business of the carrier is both interstate and intrastate, the question whether a

scheme of maximum rates fixed by the state for intrastate transportation affords a fair return must be determined by considering separately the value of the property employed in the intrastate business and the compensation allowed in that business under the rates prescribed. This was also ruled in the Smyth case (id.p.541). The reason, as there stated, is that *the state cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business,* and, on the other hand, the carrier cannot justify unreasonably high rates on domestic business, because only in that way is it able to meet losses on its interstate business.'' (Italics supplied.)

''This rule was elaborated and applied in a case involving intrastate telephone rates in Smith v. Illinois Bell Telephone Co., 282 U.S. 133. In the Illinois Bell case the question was whether intrastate telephone rates prescribed by the Illinois Commission were confiscatory. The Court held that to determine the question it was necessary to make a 'separation' to show separately the cost of rendering intrastate and interstate service. The necessity for this separation was stated by the Court as follows:

'' 'The separation of the intrastate and interstate property, revenues and expenses of the company is important not simply as a theoritical allocation to two branches of the business. *It is essential to the appropriate recognition of the competent governmental authority in each field of regulation.* In disregarding the distinction between the interstate and intrastate business of the company, the court found it necessary to pass upon the fairness of the division of interstate tolls between the American and Illinois companies. The court held that the division was reasonable and the appellants contest this ruling. But the interstate tolls are the rates applicable to interstate commerce, and neither these interstate rates nor the division of the revenue arising from the interstate rates was a matter for

the determination either of the Illinois Commission or of the court in dealing with the order of that Commission. *The Commission would have had no authority to impose intrastate rates, if as such they would be confiscatory, on the theory that the interstate revenue of the company was too small and could be increased to make good the loss.* The interstate service of the Illinois Company, as well as that of the American Company, is subject to the jurisdiction of the Interstate Commerce Commission, which has been empowered to pass upon the rates, charges and practices relating to that service. Interstate Commerce Act, § 1(1)(c), (3), (5); section 15(1); section 20(5), 49 USCA § 1(1)(c), (3), (5), section 15(1), and section 20(5). In the exercise of this jurisdiction, the interstate commerce commission has authority to estimate the value of the property used in the interstate service and to determine the amount of the revenues and the expenses properly attributable thereto. * * * *The proper regulation of rates can be had only by maintaining the limits of state and federal jurisdiction,* and this cannot be accomplished unless there are findings of fact underlying the conclusions reached with respect to the exercise of each authority. In view of the questions presented in this case, the validity of the order of the state commission can be suitably tested only by an appropriate determination of the value of the property employed in the intrastate business and of the compensation receivable for the intrastate service under the rates prescribed. Minnesota Rate Cases, 230 U.S. 352, 435, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.(N.S.) 1151, Ann. Cas. 1916A, 18.' (Italics supplied.)

"The Oregon courts considered intrastate telephone rates in Oregon in decisions subsequent to the Illinois Bell case. Without pointing out why a separation of intrastate and interstate business is necessary, the Oregon courts applied the principles of the Illinois Bell case. In Pacific Telephone and Telegraph Co. vs. Thomas, supra, the Circuit Court at Pages 376 and 389 of the reported decision dis-

cussed separation procedure. On appeal in the same case the Supreme Court in Pacific Telephone and Telegraph Co. vs. Wallace, supra, discussed the statistical processes of separation as applied to telephone business in a portion of the decision extending from Page 251 to Page 270.

"The Court finds nothing in the decisions referred to by counsel for the Commissioner or by counsel for the interveners which shows that the proposition stated in the Minnesota Rate Cases and the Illinois Bell Telephone Case is not still the law."

The respondents' brief contains a table of figures which shows that if the prescribed rate had been in effect in 1944 through 1949, and if Berger's formula for distributing indirect costs [three to lumber and one to logs] had been employed, total operations [interstate and intrastate] would have yielded a return which, as averaged over the period, would have been 8.11%. The appellant, upon the other hand, has submitted a table which shows that if the commissioner's rate had been in effect in the six-year period just mentioned, and if indirect costs had been apportioned in the manner recommended by Butler [same proportion as direct costs], the total intrastate traffic would have yielded an average return of 3.49% for the period. Further data submitted by the appellant indicates that the log traffic offered by Western would have yielded a return of only 0.01% in 1949 and would have resulted in a loss of 2.01% in 1948.

The findings of fact entered by the circuit court state:

"Considering plaintiff's intrastate traffic separately, and assigning the same average cost per car to trainload movements of logs as is assigned to single car shipments of other products, including lumber and other relatively high grade commodi-

ties, the rates prescribed by Order No. 25218 would not provide revenue adequate to cover total cost as so determined, an allowance for amortization, and a full reasonable return on invested capital. However, such rates will produce revenue for all past periods involved herein, and for the future, substantially in excess of the direct or out-of-pocket cost of rendering such intrastate service, considered separately, thereby making a contribution to indirect costs, amortization and return * * * ."

It is unnecessary to review the evidence further. It is clear that the appellant and the interveners submitted substantial evidence upon the issue of confiscation and upon the several facets of that issue of which we have taken notice. The commissioner's findings state generally that the rate which he prescribed is sufficient, but are silent upon the issues which we have been analyzing.

In an endeavor to support the prescribed rate, the respondents' brief says:

"In the first place, the general findings which the appellant admits are included in the Commissioner's order (App.br.p.27) are sufficient to support the order against an attack on grounds of confiscation under this Court's decision in Valley & Siletz R.R. Co. v. Thomas, 151 Or. 80, 87."

The decision just cited, which was announced in 1935, held that a general finding entered by the commissioner sufficed to sustain the validity of the rate order under attack in that case.

In 1939 our legislative assembly enacted Oregon Laws, 1939, Chapter 320, which it entitled Uniform Practice Act of the Public Utilities Commissioner: §§ 112-4111 to 112-4122, OCLA. Section 112-4116 provides that the commissioner, at the conclusion of a

hearing, "shall prepare and file findings of fact and conclusions of law upon the evidence received in said matter and shall make and file his order thereon." Section 112-4119 says: "Parties to any proceeding before the Commissioner may, when aggrieved by any findings of fact, conclusions of law, or order * * * prosecute a suit or proceeding against the commissioner to modify, vacate or set aside such findings of fact, conclusions of law or order." Section 112-4121 authorizes the commissioner to "modify, amend or rescind its order in said proceeding or the findings of fact and conclusions of law with reference thereto" after the evidence received by the court has been transmitted to the commissioner in the manner permitted by § 112-4121, OCLA.

It is manifest that the demands of §§ 112-4111 to 112-4122, OCLA, are not met by the entry of general findings. The rule employed by this court in the decision which the respondents cite, although valid when that case was decided, has been supplanted by the above regulation.

*Pacific Telephone & Telegraph Co. v. Flagg*, 189 Or 370, 220 P2d 522, and *Pierce Freight Lines v. Flagg*, 177 Or 1, 159 P2d 162, both of which were decided after the enactment of the 1939 statute, gave effect to its call for detailed findings. The Pierce Freight Lines opinion held that the new statute recognizes the commissioner as the fact finder, and from the other decision we quote: "Nor can we say that the general finding disapproving the budgets includes a finding of all the special facts necessary to sustain it."

The 1939 statute and the two decisions just cited are in harmony with the view that administrative agencies possess the special knowledge and expertness which is required to decide advisedly the fact issues

that come before them. Those bodies are not, however, ultimate; the judicial function is performed in collaboration with them. The phase of it which is intended to restrain the agencies from exceeding their powers cannot be properly performed unless the court knows the view which the agency entertained of the fact issues. If an erroneous conception of the law is hidden in some undisclosed finding of fact, it very likely will escape detection and correction by the courts. We are satisfied that a general finding by the commissioner no longer suffices.

The question remains as to the needed scope of the findings which the commissioner must enter. Since the statute from which we have quoted requires the commissioner to enter findings of fact, and since another statute which we cited provides for judicial review, the findings ought to set forth sufficient facts so that the reviewing court can prudently discharge its duty and not experience a sense of frustration through inability to get at the facts. The circumstance that the evidence is in the transcript and that the court, by weighing it, can determine for itself "the facts" does not suffice. The agency is the fact finder, and the undigested transcript is not a substitute for a set of findings of fact. The provisions requiring the commissioner to enter findings and the courts to grant judicial review should afford the commissioner a dependable chart indicating the scope to which his findings should extend. His knowledge of the issues which the parties presented to him should indicate still further the needed breadth and sweep of his findings. Leaving an issue of fact in such a state that the agency's reaction to the issue can be discerned only through implication does not suffice: *Atchison T. & S. F. R. Co. v. United States,* 295 US 193, 55 S Ct 748,

79 L Ed 1382, and *Panama Refining Co. v. Ryan,* 293
US 388, 55 S Ct 241, 79 L Ed 446; see, also, annotation
146 ALR 209 at 235. Nor should a court be put in a
position wherein it is forced to ferret out the facts
or seek them through engaging in mathematical calcu-
lations of a kind for which special training is required.

*Pacific Telephone & Telegraph Co. v. Flagg,* supra,
quoted the following from *Colorado-Wyoming Gas Co.
v. Federal Power Commission,* 324 US 626, 65 S Ct
850, 89 L Ed 1235:

> "* * * we must first know what the 'finding'
> is before we can give it that conclusive weight. We
> have repeatedly emphasized the need for clarity
> and completeness in the basic or essential findings
> on which administrative orders rest."

In *United States v. Chicago, Milwaukee, St. Paul &
Pacific R. Co.,* 294 US 499, 55 S Ct 462, 79 L Ed 1023,
the court uttered a complaint which is echoed in all
judicial chambers whenever the findings fall short of
the issues: "In the end we are left to spell out, to
argue, to choose between conflicting inferences."

Benjamin, in his valuable volume, Administrative
Adjudication, at page 251, says:

> "Intelligent judicial review of a quasi-judicial
> determination is possible only if the deciding officer
> has made findings of fact which show the actual
> grounds of decision,—findings sufficiently specific
> so that the reviewing court may judge, first,
> whether the findings themselves are supported by
> the evidence in the record of the quasi-judicial hear-
> ing, and, second, whether the facts so found are
> legally sufficient to support the determination. Pri-
> marily to provide the necessary basis for intelligent
> judicial review, therefore, the courts have laid down
> a requirement that such findings of fact be made
> * * *. Such findings are required whether or not

the departmental statute governing the procedure of the particular agency contains specific provision for findings of fact, as some statutes do.

"Since the primary purpose of findings of fact is to afford a basis for intelligent judicial review on the record of the quasi-judicial hearing, the requirement of findings will be imposed wherever such judicial review may be invoked. * * *.

"Findings of fact serve other purposes besides affording a basis for intelligent judicial review. The obligation to formulate findings, rather than simply to announce a result, tends to assure considered action by the administrative deciding officer. As a corollary, the findings themselves offer some assurance to the parties that the decision has been arrived at rationally, on the evidence; and the findings at least enable the parties to judge for themselves the soundness of the decision, and afford them assistance in deciding whether or not to seek to reverse it on rehearing or judicial review."

Davis on Administrative Law, § 158, states:

"A large body of judge-made law requires administrative action to be supported by adequate findings of fact, and, with respect to reasons as distinguished from findings, the Supreme Court has recently enunciated what it calls 'a simple but fundamental rule of administrative law' that 'the orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained.' The courts have imposed upon the agencies requirements concerning findings and reasons which go well beyond those which appellate courts have imposed upon trial courts, * * *."

Section 162 of the same textbook says:

"Even though the requirement ought not to be considered as emanating from the Constitution, the practical reasons for requiring administrative findings are impressive. Both legislatures and

> courts have seen fit to impose the requirement, the courts sometimes interpreting or purporting to interpret statutory provisions and sometimes creating common law. The reasons have to do with facilitating judicial review, avoiding judicial usurpation of administrative functions, assuring more careful administrative consideration, helping parties plan their cases for rehearings and judicial review, and keeping agencies within their jurisdiction.''

See, to like effect, Vom Baur, Federal Administrative Law, § 551; annotation 146 ALR 226; and 73 CJS, Public Administrative Bodies and Procedure, p 466, § 140.

 From the foregoing it is apparent that the commissioner should have entered clearly-phrased findings disposing of all the issues in the proceeding. They should have showed: (1) the manner and the amount in which he distributed the appellant's indirect costs among the traffic which the carrier bore, and (2) his segregation of the appellant's property and revenue between the interstate and intrastate phases of its operations. In making the latter statement, we have in mind the observation upon the same subject contained in *Smith v. Illinois Bell Telephone Co.*, 262 U. S. 133. The Uniform Practice Act of the Public Utilities Commissioner can be satisfied with nothing less than findings which set forth the commissioner's reaction to all of the issues. His failure to have entered the required findings rendered his rate order invalid.

 The fact that in cases which are based upon averments of confiscation the courts try the issues de novo does not relieve the commissioner of his duty to enter adequate findings of fact. As we have seen, our statute demands them. That being true, the courts and the parties are entitled to know how the commis-

sioner disposed of the fact issues. Then, too, distribution of indirect costs and segregation of properties are integral parts of rate making. Until that function has been performed, the courts cannot discharge theirs.

We observe that 13 CJS, Carriers, p 640, § 280, says:

> "The courts have no authority to fix or establish rates; nor, in some jurisdictions may they be required to do so. Courts may inquire into the reasonableness of rates, and if found unreasonable restrain their enforcement. They may not, however, as an original question exert authority over rates, but the tariff must first be fixed so that the courts may be able to judge therefrom whether or not it is reasonable and proper or excessive; * * *."

It is manifest that the task of distributing this carrier's indirect costs and of segregating its properties is one that requires skill and technical training. One would be rash who would undertake to perform that task from the data before us unaided by conferences with the parties. That situation indicates the wisdom of the rule which provides that courts review rate orders but do not attempt "as an original question" to "exert authority over rates". Further, all rate orders are prospective in character; that is, they prescribe rates governing future shipments. Hence, the power to prescribe them, like the power to write laws, is legislative in character. See *Hammond Lumber Co. v. Public Service Commission,* supra. The judicial power never operates upon prospective sets of facts; it concerns itself with existing facts. When it reviews the validity of a prescribed rate, it is essential that the rate has already been established. The courts are powerless to fill in the deficiencies in an incomplete rate order.

Without resort to further analysis, we express our belief that the commissioner's findings of fact are de-

ficient. He was not relieved of his duty to enter complete findings by the prospect of a charge of confiscation and its judicial determination.

An effort is made in the respondents' brief to sustain the prescribed rate by calling attention to the following finding entered by the circuit court:

"The multiple car rates fixed by the Commissioner in Order No. 25218 are more than 70 percent higher than the multiple car rates where the shipper furnishes the car on the other short line railroads in Oregon, and the single car rates prescribed are somewhat above the level of the normal single car rates contemporaneously in effect for comparable movements on other Oregon railroads. The single car rates prescribed are greatly in excess of the so-called 'contract rates' published by Southern Pacific Company, which contract rates apply on and move a substantial portion of the log traffic of Western Oregon.

"The rates fixed by the Commissioner in his Order No. 25218 are the maximum reasonable value to the shipper of the service for which rates are prescribed in said order."

That effort seeks to sustain the prescribed rate upon the basis of comparison of rates and a contention that the rate equalled the value of the service.

The commissioner's order contains this statement:

"No attempt was made, however, by either party to compare operating conditions as between the Valley and Siletz on the one hand and other railroads in Western Oregon on the other hand. In order for rate comparisons to be accorded any weight the conditions under the contested rates must be shown to be similar to those under the other rates."

Concerning the contention now under consideration, respondents' brief says: "The Commissioner, perhaps,

can make no argument upon this point, in view of the language of Order No. 25218.''

As is readily perceived from the foregoing, the commissioner, far from making a finding favorable to the contention concerning rate comparisons, rejected the contention and refused to consider the evidence upon the subject. His findings say nothing upon the subject of the value of the service.

■ *Pacific Telephone & Telegraph Co. v. Flagg,* supra, holds, not only that an order by the commissioner, unsupported by evidence, is invalid, but also that a court cannot write findings for the commissioner.

As is shown in preceding paragraphs, the parties presented an abundance of evidence upon the issue of confiscation, and the findings of fact are deficient.

■ Based upon *National Labor Relations Board v. Virginia Power Co.,* 314 US 469, and similar cases, we remand the proceeding to the circuit court with instructions to remand it to the commissioner to enter findings of fact in harmony with the above interpretation of the Uniform Practice Act of the Public Utilities Commissioner (§§ 112-4111 to 112-4122, OCLA).

Reversed and remanded.