Argued and submitted January 14, judgment of circuit court reversed; PUC Orders
Nos. 91-958 and 91-1140 affirmed June 29, petition for review denied
October 18, 1994 (320 Or 272)

## CITIZENS' UTILITY BOARD
## OF OREGON,
*Respondent,*

*v.*

## OREGON PUBLIC UTILITY COMMISSION,
*Appellant,*

*and*

## U S WEST COMMUNICATIONS, INC.,
*Defendant - Intervenor-Appellant.*

(9111-07171; CA A78100)

877 P2d 116

Keith L. Kutler, Assistant Attorney General, argued the cause for appellant. With him on the briefs were Theodore R. Kulongoski, Attorney General, Virginia L. Linder, Solicitor

General, and Robert M. Atkinson, Assistant Attorney General.

J. Rion Bourgeois argued the cause and filed the brief for respondent.

Mary Burns Tomlinson argued the cause and filed the briefs for intervenor-appellant.

Before Rossman, Presiding Judge, and De Muniz and Leeson, Judges.

ROSSMAN, P. J.

## ROSSMAN, P. J.

The question in this case is whether, when it issued its Order No. 91-1140 establishing extended area telephone service (EAS)[1] for the Portland metropolitan area, the Public Utility Commission (PUC) committed reversible error. The Citizens' Utility Board (CUB) has taken issue with an interlocutory ruling of PUC, Order No. 91-958, protecting from public disclosure certain documents said to contain confidential cost accounting methods of U S West Communications (USWC). CUB also challenges PUC's ruling that revenues collected for extended area service may not be refunded to customers if, after a 30-month tracking period, it is determined that the rates charged were too high, and its determination that customers need not be given comparative billings for six months following the implementation of EAS. The circuit court reversed PUC on each of those points, and PUC and USWC appeal from the circuit court's judgment. We reverse the circuit court and affirm PUC.

In June, 1989, in a proceeding known as "docket UM 189," PUC set state policy regarding the establishment of EAS in Oregon. PUC developed the criteria for determining whether EAS routes should exist between telephone exchanges and the criteria for establishing EAS regions. PUC designated the 21 exchanges in the Portland area as an EAS region and directed that a proceeding be commenced to review proposed tariffs and service plans. It directed the telecommunications utilities offering EAS service in the Portland area to file tariffs in compliance with specific rate design criteria.

---

[1] We borrow from PUC's brief to describe EAS:

" 'EAS' refers to a type of telephone service in which interexchange calls appear to the telephone customer to be intraexchange calls. An "exchange" is a local calling area defined by the telephone company and shown on maps submitted to and approved by PUC. See ORS 759.005(2)(c). Local calls are intraexchange, calls within an exchange. All other calls are interexchange calls. In the absence of EAS, interexchange service is a toll service. Toll calls (also known as long distance calls, even if the distance is not very long) are priced on a per-unit basis that usually includes a charge per minute that is based on the distance of the call.

"Typically, EAS exists between certain contiguous exchanges. For example, prior to the establishment of the Portland region, EAS existed between Beaverton and Portland and between Portland and Gresham, but not between Beaverton and Gresham. After the establishment of the region, all exchanges in the region have EAS to all other exchanges in the region."

This proceeding, which resulted in Order No. 91-1140, involves docket UM 261, in which PUC investigated and implemented EAS for the Portland metropolitan area. At PUC's request, the seven telecommunications utilities serving the Portland region, USWC among them, provided proposed tariffs and implementation schedules, cost estimates, and revenue requirements. CUB intervened as well, seeking to determine, among other questions, whether the proposed rates were based on cost. After considerable investigation and discovery and several hearings, PUC issued Order No. 91-1140, the subject of this review, establishing the Portland region EAS, approving tariffs filed by some of the utilities, requiring other utilities to file tariffs as required by the final order, specifying November 2, 1991, as the implementation date for region-wide EAS, and establishing a 30-month "tracking" period during which or after which EAS rates would be adjusted if projected revenues for service turned out to be inaccurate.

During the pendency of UM 261, a dispute arose concerning CUB's requests for documents from USWC. On November 5, 1990, CUB served a request on USWC that sought, in part, "a copy of the most recent version of the model 'DCOS' in your possession * * *" and "a copy of the new DCOS version * * * to be distributed * * * on December 10, 1990."

DCOS is a "fully distributed cost study" of USWC's telephone services in Utah. Lowell Alt, of the Utah Public Service Commission, Division of Public Utilities (the Utah commission), created the computer model at the request of the Utah commission, using data provided by USWC, for the purposes of measuring the cost of USWC's products and relating revenues to costs.

There are two versions of DCOS. The first model, 1987 DCOS, was the prototype, created from USWC's "Management Marketing Information System" (MMIS), an internal cost accounting system. 1989 DCOS is a more efficient version completed in late 1990, and based on USWC's "Cost Accounting Allocation System" (CAAS).[2] USWC responded to CUB's

---

[2] 1989 DCOS is described by the Utah commission as follows:

"Every revenue, expense and investment category or portion thereof that requires a separate direct assignment or allocation is shown in the DCOS model. Within DCOS, 946 Utah intrastate investment and expense items and a number of revenue items are assigned or allocated to 54 product groups. The DCOS

request by agreeing to provide 1987 DCOS to CUB. It also said that "[1989 DCOS] can be provided upon completion and depending on [Alt's] permission."

USWC produced 1987 DCOS; it also continued to express willingness to produce 1989 DCOS. It later indicated, however, that it considered CAAS, on which 1989 DCOS was based, to be a trade secret, and that it would produce 1989 DCOS only under a protective order, which would permit the document to be used by CUB in this proceeding, but would prohibit public disclosure. CUB then filed a motion to compel production of 1989 DCOS. USWC sought protection of 1989 DCOS. CUB filed an objection to the request, emphasizing the importance of open and public litigation. Because 1989 DCOS had been developed by the Utah commission, the hearings officer questioned USWC's proprietary interest in it, and thus its ability to seek protection of the document. The hearings officer found, additionally, that USWC had waived the confidentiality of 1989 DCOS by its disclosure of 1987 DCOS. He held that USWC had failed to show good cause for the issuance of a protective order.

USWC appealed the order to PUC. PUC requested more information from the parties, specifically about whether and to what extent 1989 DCOS had been made available to the public by the Utah commission. USWC submitted affidavits stating that the material had been made available from the Utah commission only under the terms of blanket protective orders.[3]

After the submission of additional evidence and briefing, in Order No. 91-958, PUC granted USWC's motion for a protective order for 1989 DCOS. Under the terms of the order, 1989 DCOS would be made available to CUB for the purpose of this litigation, but could not be disclosed to the public. CUB

---

model employs 19 exogenous allocation factors developed from external data and special studies and 139 allocation factors developed within the model."

[3] A blanket protective order, if granted, would authorize a party to designate any item it is required to disclose as subject to protection, meaning that the item is confidential within the proceeding and is not subject to public disclosure. Under PUC practice, blanket protective orders include a provision for a party to challenge a designation of an item as subject to the blanket protective order. Once challenged, the proponent of confidentiality has the burden to prove that the item is entitled to confidentiality.

refused to sign the order, and the matter proceeded to hearing without CUB's access to the document. In its petition to the circuit court for review of the final order in this proceeding, Order No. 91-1140, CUB assigned as error PUC's ruling in Order No. 91-958. The circuit court reversed PUC, ordering USWC to make disclosure of the materials.

■   As a preliminary matter, USWC contends that the circuit court and we lack jurisdiction to review Order No. 91-958, because CUB did not file a separate petition for review from that order within the 60-day time limit provided in ORS 756.580(4), but instead incorporated its assignments of error with regard to that order in its petition from Order No. 91-1140. We agree with CUB that Order No. 91-958 was interlocutory. It was an evidentiary ruling that did not finally determine the rights of any party to the litigation. We conclude that Order No. 91-958 was not a final order subject to review. However, CUB could and did assign the ruling in that order as error in its petition for review of Order No. 91-1140, and we therefore may consider it.

■■   Although this is an appeal from a judgment of the circuit court, we review PUC's order. *Pacific Northwest Bell Telephone Co. v. Katz,* 116 Or App 302, 305, 841 P2d 652 (1992), *rev den* 316 Or 528 (1993). There are several different applicable standards for review. The party seeking to reverse PUC has the burden to show, by "clear and satisfactory evidence," that the order is "unreasonable or unlawful." ORS 756.594. We review PUC's findings to determine whether they are supported by substantial evidence, and we may not substitute our judgment for that of PUC as to any fact supported by substantial evidence. ORS 756.598(1). To the extent that PUC's determinations involve the exercise of discretion that has been delegated to PUC, we review for whether PUC's decision is within the range of discretion allowed by the more general policies of the statutes. *See Springfield Education Assn. v. School Dist.,* 290 Or 217, 229, 621 P2d 547 (1980).

■   PUC has adopted the Oregon Rules of Civil Procedure (ORCP) as its own procedure. With regard to the issuance of protective orders, ORCP 36C provides, in part:

"Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending may make any order which justice

requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: * * * that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way[.]"

PUC has also promulgated OAR 860-12-035(1), which provides that PUC may,

"[u]pon request by a party, and for good cause shown, issue a standard protective order adopted by the Commission, which may include language agreed upon by all parties to a proceeding and the presiding officer, to limit disclosure of confidential information. Decisions by the presiding officer regarding the standard protective order may be appealed to the Commission pursuant to OAR 860-14-091."

No one challenges PUC's authority to issue protective orders or its adoption of the ORCP as its procedure in that context. Under Oregon's interpretation of ORCP 36C and the federal decisions interpreting its federal counterpart, Federal Rule of Civil Procedure 26(c), as a matter governing the conduct of the proceeding, a decision to grant or deny a protective order is reviewed for an abuse of discretion. *See Beckman Industries, Inc. v. International Ins. Co.*, 966 F2d 470 (9th Cir 1992); *Farmers Ins. v. Hansen*, 46 Or App 377, 611 P2d 696 (1980). We agree with PUC that that same standard should apply to our review of PUC's decision to protect 1989 DCOS.

In contrast, we review the facts on which PUC based its decision to grant the protective order for whether they are supported by substantial evidence. PUC found that there were significant differences between 1987 DCOS and 1989 DCOS. It found that 1987 DCOS was based on the MMIS cost accounting system, but that the 1989 model duplicates essential parts of the latest version of the CAAS cost accounting system. Additionally, 1989 DCOS had been created with different software from 1987 DCOS, so that it could be used with a mainframe computer system, which would allow USWC to retrieve data electronically from other USWC systems and to transfer data into the CAAS system. 1989 DCOS incorporated federally mandated changes. It also incorporated products and services that had been introduced subsequent to the 1987 model. PUC found that 1989 DCOS was a complete replacement of the 1987 model. Those findings are supported by substantial evidence.

PUC found that USWC treats CAAS information as confidential, and that disclosure of CAAS had been made only under the terms of protective orders or nondisclosure agreements. It found, further, that USWC had made a major investment in CAAS, and that the model would be difficult to duplicate without access to USWC's own system. Those findings are supported by substantial evidence.[4]

PUC found that a market exists for the sale of cost-accounting systems like CAAS to other telecommunications utilities and that disclosure of CAAS information contained in 1989 DCOS would compromise USWC's ability to market its own system. Those findings are supported by substantial evidence.

■ Basing its argument in part on ORCP 43, CUB contends that USWC waived its right to object to the production of 1989 DCOS. ORCP 43B provides, in part:

"The party upon whom a request [for production of documents] has been served shall comply with the request, unless the request is objected to with a statement of reasons for each objection before the time specified in the request for inspection and performing the related acts."

PUC found that, although USWC had not complied precisely with the terms of ORCP 43B because it had failed initially to object to CUB's request for 1989 DCOS, the responses that USWC made to CUB's request indicating a willingness to disclose 1989 DCOS were "conditional," and the time agreed for production was "somewhat indefinite." PUC reasoned that ORCP 43B does not expressly provide that objections are deemed waived unless made within the time for production. Additionally, PUC noted that ORCP 43B further provides that a requesting party may file a motion to compel discovery under ORCP 46A "with respect to any objection to or other failure to respond to the request * * *." With those considerations in mind, PUC held that ORCP 43 did not require that USWC's

---

[4] CUB contends that, in framing their arguments regarding protection, PUC and USWC have erroneously focused on whether CAAS, rather than 1989 DCOS, constitutes a trade secret. We do not think that the focus is misplaced. If, as PUC found, CAAS forms the basis for 1989 DCOS, then disclosure of 1989 DCOS would effectively disclose CAAS as well. Although both 1987 DCOS and 1989 DCOS deal with the same subject matter, USWC's distributed costs, USWC does not seek protection of the subject matter of the models, but of the internal accounting system used in 1989 DCOS that forms the basis for the model.

initial agreement to provide 1989 DCOS be treated as a waiver of the right to seek confidentiality.[5] PUC's findings are supported by substantial evidence. Additionally, we agree with PUC that ORCP 43B does not require the conclusion that USWC waived the right to seek protection of 1989 DCOS by failing to seek protection sooner.[6]

■     PUC held, additionally, that USWC did not waive the confidentiality of 1989 DCOS by disclosing 1987 DCOS to CUB without first seeking a protective order. PUC found that the 1987 and 1989 models are significantly different from each other in large part because they are based on different internal cost accounting systems. Substantial evidence supports PUC's findings, and it may be reasonably concluded from those findings that USWC did not waive the confidentiality of 1989 DCOS by disclosing 1987 DCOS.

■     There is a substantial body of federal law relating to the substantive showing necessary to obtain a protective order. The party seeking protection must show that the information is a trade secret or confidential commercial information. *Zenith Radio Corporation v. Matsushita Electric Industrial Company*, 529 F Supp 866 (ED Pa 1981). The party must also establish good cause for the protective order by demonstrating that disclosure "will work a clearly defined and serious injury." 529 F Supp at 890. Broad allegations of harm unsubstantiated by specific examples or articulated reasoning do not satisfy the good cause requirement. *Cippolone v. Ligget Group, Inc.*, 785 F2d 1108, 1121 (3rd Cir 1986). The harm must be significant, not a mere trifle.

Courts traditionally examine six factors in determining whether information constitutes a trade secret: (1) the extent to which the information is known outside the business;

---

[5] PUC admonished USWC:

"While the Commission will not deny the protective order on procedural grounds in this case, USWC's dilatory conduct in seeking protection has placed significant burdens on both CUB and the Commission. In the future, USWC should take care to avoid such conduct. Otherwise the Commission may conclude that USWC is not acting in good faith with respect to confidentiality designations."

[6] *Goldsborough v. Eagle Crest Partners, Ltd.*, 314 Or 336, 838 P2d 1069 (1992), is distinguishable. There, the issue was whether a party's voluntary disclosure of documents constitutes a waiver of the right to seek protection.

(2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to safeguard the secrecy of the information; (4) the value of the information to the business or its competitors; (5) the amount of effort or money expended by the business in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *See, e.g., Waelde v. Merck, Sharp & Dohme*, 94 FRD 27 (ED Mich 1981).

■ CUB contends that, because 1989 DCOS was developed by the State of Utah as a regulatory tool, USWC has no proprietary interest in the model, and is not entitled to seek protection of information that it contains. PUC found that, although the model had been developed by the Utah commission, the CAAS data that formed the basis for the model had been disclosed to the Utah commission only under the terms of blanket protective orders. In view of that, PUC found that USWC did not lose its proprietary interest in CAAS or its ability to seek protection of 1989 DCOS. PUC's findings are supported by substantial evidence, and its conclusion reasonably follows from its findings.

PUC found, additionally, that USWC has kept the CAAS system confidential, that the system has been costly to develop, that it has a substantial value to USWC, and that it could not be easily duplicated by others. Each of those findings is supported by substantial evidence. PUC's findings together reasonably support its conclusion that USWC has established that there is material in 1989 DCOS that constitutes a trade secret.

The second prong of the test for protection requires USWC to show that disclosure would result in a clearly defined and serious injury. PUC found that there is a market for cost accounting systems such as CAAS and that the unprotected disclosure of CAAS would impair USWC's ability to market its system to other telecommunications companies. Those findings are supported by substantial evidence. PUC concluded that that constituted "a potential serious injury to USWC that has been clearly defined." That conclusion rationally follows from PUC's findings. We hold that PUC did not abuse its discretion in holding that USWC has established good cause and in granting the protective order.

■ We reject CUB's contention that there is a third prong to the test for determining whether to issue a protective order, which would require a balancing of the public's interest in disclosure against the potential harm to USWC. Although that may be a relevant factor in determining whether material that has become a part of a judicial record should remain subject to a protective order, *see Zenith Radio Corporation v. Matsushita Electric Industrial Company, supra,* 529 F Supp at 895, it has no bearing on the determination as to whether materials that are sought to be discovered should be subject to a protective order.

The impetus for CUB's entire argument with regard to the protective order has been its view that protective orders offend a strong policy that litigation of public matters should take place in the public eye. Moved by that philosophy, CUB has refused to sign any of the protective orders issued by PUC and has thereby eliminated its own access to information that it claims is relevant to the proceeding. The legislature has explicitly approved the use of protective orders by enacting ORCP 36C. There is no contention that PUC could not adopt that provision as its own. CUB contends, nonetheless, that it cannot meaningfully participate in PUC proceedings if PUC issues protective orders and proceedings are conducted "in secrecy." That is not borne out by the facts. In the first place, the proceedings are not conducted in secrecy. The very existence of CUB is the assurance of that. In creating CUB, the legislature provided an advocate for utility customers. ORS 774.020. Additionally, CUB had full access to the protected information, but it chose not to avail itself of protected access, choosing instead to insist on full public disclosure. It is for CUB to determine whether that choice permits it to fulfill its duty under the statutes to be the voice for utility customers.

■ ORCP 46A(4) authorizes the award of attorney fees as a sanction for the failure to allow discovery. CUB sought fees before PUC under that section for having prevailed in an earlier attempt by USWC to obtain a blanket protective order. Both the referee and PUC denied CUB's request. The circuit court reversed and, having also reversed PUC's protective Order No. 91-958, also awarded fees to CUB for having prevailed on that order. We agree with PUC that no statute specifically governing PUC authorizes the assessment of attorney fees against any

party to a PUC proceeding. Absent specific statutory authorization for fees, we conclude that PUC's general authority to adopt procedural rules, ORS 756.060, does not include the authority to adopt provisions regarding attorney fees. *See Oregon Occupational Safety v. Don Whitaker Logging*, 123 Or App 498, 861 P2d 368 (1993), *rev den* 318 Or 326 (1994). Accordingly, PUC's adoption, generally, of the ORCP as its own rules of procedure may not incorporate the provisions of those rules regarding attorney fees. The circuit court erred in awarding fees to CUB.

■   The other assignments of error relate to the circuit court's reversal of two rulings by PUC regarding the implementation of EAS. The first ruling concerned whether PUC should have ordered that the tariffs filed with and approved by PUC with regard to EAS were subject to refund after the 30-month tracking period, should PUC determine that revenues received by the utilities were excessive.

Tariffs are documents that provide the rates and other terms and conditions of utility service. Each utility has a tariff on file for each service that it offers. In its docket UM 189, PUC adopted the rate design criteria for EAS conversion. PUC required the seven telecommunications companies located in the proposed EAS to file tariffs for region-wide EAS. PUC required that the tariff filings be revenue neutral. That means that, despite certain rate changes for the region, the net cumulative effect to the utilities was targeted to be zero, *i.e.*, no increase or decrease in revenue. If the seven utilities were wrong in their assumptions about the costs and revenues of EAS, then the seven utilities could receive more or less than the expected amount of revenue. The hearing in UM 261 was held to consider the proposed rates.

In its Order No. 91-1140, PUC discussed at length USWC's compliance with each of the criteria set forth in UM 189, based on PUC staff evaluation. PUC evaluated USWC's proposed methods for calculating net revenue neutrality, its proposed method for calculating EAS revenue requirements and its proposed method for tracking EAS costs to determine net revenue neutrality. In each instance, PUC adopted its staff's recommendations, rather than USWC's proposed methods, for establishing the tariffs. It then approved USWC's proposed rates as just and reasonable. PUC established a 30-month

tracking procedure, whereby PUC and the utilities would monitor the rates for a period of 30 months to enable them

> "to determine expeditiously whether over collection and under collection of revenues is occurring and to adjust rates accordingly."

PUC rejected CUB's contention that the tariffs should also be subject to refund pending the 30-month tracking period. PUC ruled that, because the tariffs had been filed at the direction of PUC and had already been the subject of extensive investigation and hearing, they were not "new" rates subject to the provisions of ORS 759.180 and ORS 759.185.[7] Additionally, PUC ruled that ratepayers would be adequately protected from significant over collection by the 30-month tracking procedure. CUB contends that PUC erred as a matter of law in failing to declare the tariffs subject to refund.

ORS 759.180 provides, in part:

> "(1)  Except as provided in ORS 759.030 and 759.195, whenever any telecommunications utility files with the commission any rate or schedule of rates stating or establishing a new rate or schedule of rates or increasing an existing rate or schedule of rates, the commission may, either upon written complaint or upon the commission's own initiative, after reasonable notice, conduct a hearing to determine the propriety and reasonableness of such rate or schedule."

ORS 759.185 provides, in part:

> "(1)  The commission may, pending such investigation and determination, order the suspension of the rate or schedule of rates, provided the initial period of suspension shall not extend more than six months beyond the time when such rate or schedule would otherwise go into effect. * * *

> "* * * * *

> "(3)  After full hearing, whether completed before or after such rate or schedule has gone into effect, the commission may make such order in reference thereto as would be proper in a proceeding initiated after such rate or schedule has become effective. ·

---

[7] Contrary to CUB's contention, PUC did not hold that it had no authority to order the tariffs subject to refund, only that it would not so order, because the tariffs did not fall within the provisions of ORS 759.185.

"(4)   If the commission is required to or determines to conduct a hearing on a rate or schedule of rates filed pursuant to ORS 759.180, but does not order suspension thereof, any increased revenue collected by the telecommunications utility as a result of such rate or rate schedule becoming effective shall be received subject to being refunded. If the rate or rate schedule thereafter approved by the commission is for a lesser increase or for no increase, the telecommunications utility shall refund the amount of revenues received that exceeds the amount approved as nearly as possible to the customers from whom such excess revenues were collected, by a credit against future bills or otherwise, in such manner as the commission orders.

"(5)   The commission may, in a suspension order, authorize an interim rate or rate schedule under which the telecommunications utility's revenues will be increased by an amount deemed reasonable by the commission, not exceeding the amount requested by the telecommunications utility. An interim rate or rate schedule shall remain in effect until terminated by the commission."

We agree with CUB that ORS 759.180 applies to any tariff establishing a new rate, whether that tariff be for a new or existing service. Thus, the rates for EAS that PUC requested the utilities to file were new rates, and the requirement for a hearing set out in ORS 759.180 was applicable. A hearing was held in this proceeding for the purpose of determining whether the proposed rates were just and reasonable. ORS 759.185(4) relates to cases involving proposed tariffs that are not suspended pending a hearing. When, in those circumstances, rate-payers are subject to the new or increased rates pending the outcome of the hearing, ORS 759.185(4) provides that the utility may be ordered to refund revenue received pending the outcome of the hearing in excess of the rates ultimately approved by PUC. When, as here, however, the tariffs are investigated and approved by PUC *before* they go into effect, there is nothing to refund. Because the proposed rates were investigated and approved by PUC before they went into effect, we conclude that ORS 759.185(4) is not applicable. The rates as approved by PUC are permanent, subject to the 30-month "tracking period." PUC did not err in refusing to declare the rates subject to refund under ORS 759.185(4).

CUB claims that PUC's general authorizing statutes, ORS 756.040 and ORS 756.515, permit PUC to require a

refund. *See Pacific Northwest Bell Telephone v. Katz, supra.* We need not decide whether either of those statutes supports the view that PUC would have been authorized in this case to order that the tariffs at issue be subject to refund; there is no contention that either statute *required* PUC to order that the tariffs be subject to refund. PUC did not err.

The final assignment of error relates to the circuit court's reversal of PUC's decision declining to order the utilities to provide comparative billings to customers in the EAS region. We agree with PUC that this is a matter that we review for an abuse of discretion.

Before the implementation of the Portland region EAS, customers had two rate options. With the implementation of the Portland EAS region, customers in the region have several additional rate options. PUC determined that customers should be provided information to enable them to make an informed choice as to which type of service they want. CUB recommended that the utilities be required to inform customers, in each telephone bill for the first six months, what the bill would be under each option of EAS. The utilities claim that it is too costly to generate "dual bills" for customer comparison, which would require reformatting the billing process and recording all customer usage information. The additional cost would be recouped from customers through higher rates.

PUC rejected CUB's request for monthly dual billings. It developed these minimum standards in order to ensure that customers received adequate information about the available EAS options to enable them to make informed choices as to which type of service they want:

1. Customers can change service options for six months following the implementation of EAS without incurring a fee. That way, customers can compare the costs of the different options by comparing the bills that they receive under the different options.

2. A brochure describing each of the options must be mailed to each customer before the implementation of EAS and again 90 days after its implementation. The brochure must include, among other things: a simple, non-technical explanation of how to calculate which option is to the customer's advantage, a description of at

least two methods for choosing the best option: (1) changing service and comparing billings, and (2) keeping a log and estimating minutes of use. The brochure should notify the customer that service can be changed at no charge for six months.

In our view, the issue of what type of information must be given to a customer about a particular telephone service is governed largely by the exercise of discretion as to which informational method is most reasonable under the circumstances. There is no doubt that the facts on which PUC based its decision are supported by substantial evidence. The question on review is whether, based on those facts, PUC properly exercised its discretion when it rejected CUB's recommendation for comparative billings. We conclude that it did. Although clearly not as simple for the customer as comparative billings would have been, it is undisputed that the method selected by PUC provides customers with an adequate means of comparing the different service options. There is no ground for disturbing PUC's decision.

In summary, PUC's order protecting 1989 DCOS from public disclosure is affirmed. We also affirm PUC's rulings that the revenues received from EAS service during the 30-month tracking period are not subject to refund and that the utilities need not provide comparative billings. PUC's ruling that CUB is not entitled to attorney fees is also affirmed.

Judgment of circuit court reversed; PUC Orders 91-958 and 91-1140 affirmed.