Submitted on remand from the Oregon Supreme Court May 3, affirmed June 21, petition for review denied October 17, 1995 (322 Or 193)

PACIFIC NORTHWEST BELL TELEPHONE COMPANY,
dba US West Communications, Inc.,
*Respondent,*

*v.*

Ron EACHUS,
Nancy Ryles and Myron B. Katz,
*Respondents,*

CITIZENS' UTILITY BOARD,
*Appellant.*

UTILITY REFORM PROJECT,
*Plaintiff,*

*v.*

OREGON PUBLIC UTILITY COMMISSION,
*Defendant.*

PACIFIC NORTHWEST BELL TELEPHONE COMPANY,
dba US West Communications, Inc.,
*Respondent,*

*v.*

Ron EACHUS,
Nancy Ryles and Myron B. Katz,
*Defendant,*

CITIZENS' UTILITY BOARD,
*Intervenor.*

UTILITY REFORM PROJECT,
*Appellant,*

*v.*

OREGON PUBLIC UTILITY COMMISSION,
*Respondent.*

(9001-0435; CA A69043)

898 P2d 774

Daniel W. Meek argued the cause and filed the briefs for Utility Reform Project.

Rion Bourgeois argued the cause and filed the briefs for appellant Citizens' Utility Board.

Charles L. Best argued the cause and filed the brief for respondent Pacific Northwest Bell Telephone Company.

Keith L. Kutler, Assistant Attorney General, argued the cause for respondents Oregon Public Utility Commission, Ron Eachus, Nancy Ryles and Myron B. Katz. On the brief were Theodore R. Kulongoski, Attorney General, Virginia L. Linder, Solicitor General, and Robert M. Atkinson, Assistant Attorney General.

Before Riggs, Presiding Judge, and De Muniz and Leeson, Judges.

RIGGS, P. J.

**RIGGS, P. J.**

■     This case is before us on remand from the Oregon Supreme Court. 320 Or 557, 888 P2d 562 (1995). It is an appeal from a circuit court judgment that stayed in part and affirmed in part an order of the Public Utility Commission (PUC) in an "own motion" proceeding, ORS 759.515, in which PUC, after a contested case hearing, reduced the rates of Pacific Northwest Bell Telephone Co. (PNB), nka US West Communications, Inc. The appellants are two citizens' advocacy organizations, the Citizens' Utility Board (CUB), and the Utility Reform Project (URP). We review PUC's decision pursuant to ORS 756.594 and may reverse only if the order is unreasonable or unlawful or not supported by substantial evidence.

    On July 1, 1988, PNB filed a petition with PUC seeking an alternative regulatory form. PUC opened docket UT 80 to investigate that request. On December 6, 1988, PUC staff reported to the Commission that it had examined PNB's revenues, expenses, rate base and capital structure and that PNB was over-earning by approximately $50 to $60 million and recommended a separate docket to investigate PNB's revenue requirement. In response, PUC opened this "own motion" rate case pursuant to ORS 756.515.[1] The case was docketed as UT 85.

---

[1] ORS 756.515 provides:

"(1) Whenever the commission believes that any rate may be unreasonable or unjustly discriminatory, or that any service is unsafe or inadequate, or is not afforded, or that an investigation of any matter relating to any public utility, telecommunications utility, railroad, air carrier, motor carrier or other person should be made, or relating to any person to determine if such person is subject to the commission's regulatory jurisdiction, the commission may on motion summarily investigate any such matter, with or without notice.

"(2) If after making such investigation the commission is satisfied that sufficient grounds exist to warrant a hearing being ordered upon any such matter, the commission shall furnish any public utility, telecommunications utility, railroad, air carrier, motor carrier or other person interested a statement notifying it of the matters under investigation, which statement shall be accompanied by a notice fixing the time and place for hearing upon such matters in the manner provided in ORS 756.512 for notice of complaint.

"(3) Thereafter proceedings shall be had and conducted in reference to the matters investigated in like manner as though complaint had been filed with the commission relative thereto, and the same orders may be made in reference thereto as if such investigation had been made on complaint.

"(4) Except as provided in ORS 761.120(1), *the commission may, after making an investigation on the commission's motion, but without notice or hearing, make such findings and orders as the commission deems justified or*

On January 6, 1989, CUB filed a petition to intervene in UT 85 and a motion seeking an order pursuant to ORS 756.515(4) to require PNB to immediately file interim tariffs reducing its rates. On January 31, 1989, URP filed a complaint and petition to intervene in UT 85. PUC allowed both CUB's and URP's intervention. In Order 89-132, it denied CUB's motion to require PNB to file interim reduced rates. The order states that no purpose would be served by immediately reducing PNB's rates pursuant to ORS 756.515(4), because under ORS 756.515(5) and (6), PNB could obtain an automatic stay of the order simply by appealing it.

In the light of PUC's refusal to require PNB to reduce its rates, CUB asked that PUC declare PNB's existing rates to be interim and subject to refund if PNB was ultimately required to reduce its rates.[2] PUC denied that motion

*required by the results of such investigation.* Except as provided in subsections (5) and (6) of this section such findings and orders have the same legal force and effect as any other finding or order of the commission.

"(5) In addition to any other remedy provided by law, any party aggrieved by an order entered pursuant to subsection (4) of this section may request the commission to hold a hearing to determine whether the order should continue in effect. Any such request for hearing shall be submitted to the commission not later than 15 days after the date of service of the order, and the commission shall hold the hearing not later than 60 days after receipt of such a request for hearing.

"(6) Except as provided in subsection (7) of this section, if the commission receives a request for hearing pursuant to subsection (5) of this section, the order is suspended pending the outcome of the hearing unless the commission finds that the order is necessary for the public health or safety or to prevent the dissipation of assets of a business or activity subject to the commission's regulatory jurisdiction." (Emphasis supplied.)

[2] ORS 759.185 provides:

"(1) The commission may, pending such investigation and determination, order the suspension of the rate or schedule of rates [sought by the utility], provided the initial period of suspension shall not extend more than six months beyond the time when such rate or schedule would otherwise go into effect. If the commission finds that the investigation will not be completed at the expiration of the initial suspension, the commission may enter an order further suspending such rate or schedule for not more than three months beyond the last day of the initial suspension.

"(2) This section does not prevent the commission and the telecommunications utility from entering into a written stipulation at any time extending any period of suspension.

"(3) After full hearing, whether completed before or after such rate or schedule has gone into effect, the commission may make such order in reference thereto as would be proper in a proceeding initiated after such rate or schedule has become effective.

in Order 89-491, ruling that it lacked authority to declare existing rates interim and subject to refund.

Hearings were held between June 5 and June 27, 1989. URP made no appearance at the hearings. On December 29, 1989, in Order 89-1807, PUC ordered PNB to reduce its revenues by $24,057,000 annually by reducing its rates effective January 1, 1990. In that order, PUC rejected its own staff recommendations to reduce by an additional $3.8 million per year PNB revenues earmarked for research and development performed by Bell Communications Research, Inc. (Bellcore), a centralized research and development organization funded by the seven regional "Baby Bell" telephone companies. PUC also denied a request by CUB for a refund of the excess revenues collected by PNB during the pendency of the rate case.

Pursuant to ORS 756.580,[3] PNB and URP each filed "suit" in the circuit court of Multnomah County, the county in which PNB's principal office is located, seeking to vacate PUC's order. CUB intervened. PUC filed motions to dismiss both suits for lack of jurisdiction. The court denied those motions, and on April 24, 1990, it issued an order pursuant to

---

"(4) If the commission is required to or determines to conduct a hearing on a rate or schedule of rates filed pursuant to ORS 759.180, *but does not order suspension thereof, any increased revenue collected by the telecommunications utility as a result of such rate or rate schedule becoming effective shall be received subject to being refunded.* If the rate or rate schedule thereafter approved by the commission is for a lesser increase or for no increase, the telecommunications utility shall refund the amount of revenues received that exceeds the amount approved as nearly as possible to the customers from whom such excess revenues were collected, by a credit against future bills or otherwise, in such manner as the commission orders.

"(5) *The commission may, in a suspension order, authorize an interim rate or rate schedule under which the telecommunications utility's revenues will be increased by an amount deemed reasonable by the commission, not exceeding the amount requested by the telecommunications utility. An interim rate or rate schedule shall remain in effect until terminated by the commission.*" (Emphasis supplied.)

[3] ORS 756.580(1) provides:

"A party to any proceeding before the commission, when aggrieved by any findings of fact, conclusions of law or order, including the dismissal of any complaint or application by the commission, may prosecute a suit against the commission to modify, vacate or set aside such findings of fact, conclusions of law or order."

ORS 756.590[4] staying PUC Order 89-1807. The effect of the stay was to relieve PNB of the duty of reducing its rates pending the outcome of the litigation. PNB agreed that if PUC ultimately prevailed in the litigation, PNB would be required to refund to its customers all revenues received in excess of the target revenue set in Order 89-1807, from the effective date of the PUC order, January 1, 1990, until the conclusion of any appeals.

On March 7, 1991, the circuit court affirmed PUC's order in all respects. It denied CUB's request to lift the stay of Order 89-1807 pending further appeals.

PNB and URP filed notices of appeal to this court and CUB filed a notice of cross-appeal. After reaching a negotiated settlement with PUC, PNB withdrew its notice of appeal. Pursuant to the settlement, PNB reduced its rates as required by Order 89-1807 and refunded to its ratepayers the excess revenue it had received since January 1, 1990.

On March 30, 1994, we remanded the case to the circuit court with instructions to dismiss the proceeding, on the ground that the Multnomah County Circuit Court did not have subject matter jurisdiction for the appeal of own motion rate cases. *Pacific Northwest Bell Telephone Co. v. Eachus*, 127 Or App 177, 181, 872 P2d 21 (1994), *rev allowed* 320 Or 109. The Supreme Court reversed our decision and remanded the case to us for further proceedings. We now review PUC's order.

CUB's contentions all relate to its desire to obtain for ratepayers a refund of rates paid between the date on which PUC opened the own motion proceeding and the date it issued Order 89-1807. CUB contends that PUC erred when it denied CUB's motion to declare as "interim" PNB's rates as of December 6, 1988, and subject to refund from that date, pending the outcome of the rate case. CUB notes that when a telecommunications utility seeks a rate change or increase,

---

[4] ORS 756.590 provides:

"After the commencement of a suit under ORS 756.580, the circuit court may, for cause shown, upon application to the circuit court or presiding judge thereof, and upon notice to the commission and hearing, suspend or stay the operation of the order of the commission complained of until the final disposition of such suit * * *."

PUC has the authority and traditionally grants the utility an interim rate increase subject to refund, pending hearing on the reasonableness of the rate, pursuant to ORS 759.185. As we held in *Citizens' Utility Board v. Public Utility Commission,* 128 Or App 650, 877 P2d 116, *rev den* 320 Or 272 (1994), that statute applies only in the context of *new* or *increased* rates sought by the utility pursuant to ORS 759.180.[5] CUB does not argue that ORS 759.185 is directly applicable to this own motion proceeding; it contends, however, by way of analogy, that when PUC brings an own motion proceeding to investigate existing rates, ratepayers are entitled to have the existing rates declared to be interim rates and subject to refund pending the outcome of the own motion proceeding.

ORS 756.515 itself makes no provision for declaring existing rates interim. CUB relies on three general provisions regarding PUC's ratemaking authority: Subsection (4) of ORS 756.515 provides that, after making an investigation on its own motion, PUC may "make such findings and orders as the commission deems justified or required by the results of such investigation." ORS 756.040(1) authorizes PUC to protect ratepayers and the public "from unjust exactions and practices and to obtain for them adequate service at fair and reasonable rates." ORS 756.040(2) vests powers in the commission "to do all things necessary and convenient" in the exercise of its jurisdiction. CUB contends that within those

---

[5] ORS 759.180(1) provides:

"Except as provided in ORS 759.030 and 759.195, whenever any telecommunications utility files with the commission any rate or schedule of rates stating or establishing a new rate or schedule of rates or increasing an existing rate or schedule of rates, the commission may, either upon written complaint or upon the commission's own initiative after reasonable notice, conduct a hearing to determine the propriety and reasonableness of such rate or schedule. The commission shall conduct such a hearing upon written complaint filed by the telecommunications utility, its customer or customers, or any other proper party within 60 days of the telecommunications utility's filing; provided that no hearing need be held if the particular rate change is the result of an automatic adjustment clause. At such hearing the telecommunications utility shall bear the burden of showing that the rate or schedule of rates proposed to be established or increased or changed is just and reasonable. The term 'automatic adjustment clause' means a provision of a rate schedule, authorized pursuant to ORS 759.195(6), which provides for rate increases, or decreases or both, without prior hearing, reflecting increases, decreases or both in costs incurred by a telecommunications utility and which is subject to review by the commission at least once every two years."

broad grants of authority to oversee ratemaking, the legislature has given to PUC the power to issue an order declaring existing rates to be interim.

We agree that the text of those statutes are broad enough to permit the type of order that CUB seeks. However, other provisions of the public utility statutes show that PUC's authority to declare rates to be interim and subject to refund is circumscribed.

ORS 759.175 to ORS 759.250 establish the process by which a telecommunications utility receives approval of its rate schedule. That process includes the filing of schedules, subject to public inspection, ORS 759.175; the holding of a hearing in which the telecommunications utility must show that its requested rates are "just and reasonable," ORS 759.180; and the suspension of new rates pending hearing, ORS 759.185. ORS 759.205 provides that, once a rate schedule has been approved,

> "[n]o telecommunications utility shall charge, demand, collect *or receive* a greater or lesser compensation for any service performed by it within the state, or for any service in connection therewith, than is specified in printed rate schedules as may at the time be in force, or demand, collect or receive any rate not specified in such schedule. *The rates therein are the lawful rates until they are changed as provided in this chapter.*" (Emphasis supplied.)

Thus, rates that have been approved and are in force may be adjusted only pursuant to the process described in the statutes.

Although PNB was earning more than its authorized rate of return until Order 89-1807 reduced PNB's rates, it was doing so pursuant to rates that had been approved by and filed with PUC and that complied with all previous PUC rate orders. *Compare Pacific Northwest Bell Telephone Co. v. Katz*, 116 Or App 302, 841 P2d 652, *rev den* 316 Or 527 (1993) (PUC has authority to order a refund of amounts over-collected under temporary rules that failed to comply with an ordered revenue reduction). The effect of an order declaring those existing rates to be interim would have been to allow a rate reduction before the reduced rate had been approved; it would, in essence, have been a retroactive adjustment which

we conclude would have been inconsistent with the emphasized portion of ORS 759.205. We hold that it was not error for PUC to refuse to declare PNB's existing rates to be interim and subject to refund.[6]

CUB contends that it is good "regulatory and judicial policy" to give a refund of excess revenue that a utility earns during the pendency of a rate case seeking to reduce the company's rates. Those are arguments that are more appropriately made to the agency and the legislature, not this court.

■ CUB seeks a reversal of the circuit court's refusal to lift its stay of the PUC order, issued pursuant to ORS 765.590. In the light of PNB's dismissal of its appeal and its implementation of the rate reduction and refund of excess revenues collected pending appeal from the effective date of the PUC order, a decision on that issue could no longer have a practical effect on or concerning the rights of the parties; we therefore conclude that the question is moot. *Barcik v. Kubiaczyk*, 321 Or 174, 182, 895 P2d 765 (1995); *Brumnett v. PSRB*, 315 Or 402, 848 P2d 1194 (1993).

■ URP's appeal challenges PUC's allowance of PNB's research and development costs as an expense for the purpose of determining PNB's allowable revenue. PUC urges that we dismiss the appeal for the reason that URP failed to appear at the PUC hearing and therefore is not "aggrieved" within the meaning of ORS 756.580. That statute provides, in part:

"(1) A *party* to any proceeding before the commission, when *aggrieved* by any findings of fact, conclusions of law or

---

[6] We note that, until it was repealed in 1981, ORS 751.235 provided express authority for the adjustment or suspension of existing utility rates under the Commissioner's "emergency" powers. Even under that statute, however, the adjustment of existing rates could be suspended pending the outcome of a hearing sought by the utility. No comparable provision exists today, although certain aspects of ORS 756.515 are similar. After the events in this case, the Oregon Legislature enacted ORS 759.200. That statute authorizes PUC to enter an order deferring a rate decrease if the revenue reduction results from one of the events listed in ORS 759.200(2). For example, if the federal government enacts a corporate tax decrease that affects a telephone company, then PUC may enter an order deferring a rate decrease reflecting the tax reduction. Then, in the company's next rate case, PUC may include that deferred rate decrease in the company's rates. ORS 759.200(1). The effect of the deferral is similar to declaring present rates to be interim rates subject to refund; the company's rates remain in effect, but amounts collected under the deferral are subject to refund through reduced rates following completion of the rate case.

order, * * * may prosecute a suit against the commission to modify, vacate or set aside such findings of fact, conclusions of law or order." (Emphasis supplied.)

PUC contends that a party cannot be "aggrieved" by PUC's decision unless that party has raised issues before the agency. *Mullenaux v. Dept. of Revenue*, 293 Or 536, 651 P2d 724 (1982). In *Mullenaux*, the court cited its opinion in *Marbet v. Portland Gen. Elect.*, 277 Or 447, 456, 561 P2d 154 (1977), and discussed generally the proposition that a party to an administrative proceeding must "exhaust administrative remedies" before seeking judicial review:

> "A party does not exhaust his administrative remedies simply by stepping through the motions of the administrative process without affording the agency an opportunity to rule on the substance of the dispute. Exhaustion of administrative remedies is not accomplished through the expedience of default." 293 Or at 541.

This is not a case in which a party's failure to appear has foreclosed the agency's opportunity to rule on the substance of the dispute. Although URP did not appear before PUC after filing a request to intervene, other parties briefed and presented evidence concerning the matters that were at issue before PUC, and the agency had a full opportunity to decide the merits of the case. There is no dispute that URP has adopted virtually the same position as PUC staff in its view that a portion of PNB's Bellcore expenses should be disallowed. URP is "aggrieved" by the agency's decision not to accept that view and to permit PNB to include its Bellcore expenses in the calculation of its income requirements. In this context, we conclude that URP's decision not to put on its own evidence or to file its own briefs but instead to permit the other parties to make the record before the agency does not preclude it from seeking judicial review. Accordingly, we hold that, pursuant to ORS 756.580, URP could prosecute this suit seeking to modify PUC's order. We note, however, that our review of PUC's order is limited to those issues that were preserved for review by having been raised at the hearing. *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 380, 823 P2d 956 (1991).

URP contends in its first assignment of error that PUC erred in refusing to reduce PNB's revenue requirement

for 1987 by excluding research and development costs paid by PNB to Bellcore. As noted above, URP relies primarily on arguments made to the commission by PUC staff. Staff sought to disallow a portion of PNB's Bellcore expenses on the ground that the challenged expenses were for projects aimed at future services or improvements that may ultimately benefit deregulated or unregulated services and that do not produce any current benefit to ratepayers.

PUC rejected its staff's proposed disallowance. Its opinion contains a lengthy discussion concerning the difficult and ongoing question of how to treat research and development expenses and how to allocate those costs to ratepayers. We quote that discussion at length, to permit a more complete understanding of the issues and the parties' contentions:

"Bellcore expenditures were addressed in Docket UT 43, PNB's last general rate case. Commissioner Charles Davis issued Order No. 87-406 in that proceeding, which stated:

" 'The Commissioner's task in setting rates is to identify the costs of providing utility service, and then to fairly allocate responsibility for those costs. This necessarily involves allocations among services, among customer classes, and between present and future customers. * * *

" 'Allocation of Bellcore costs between present and future customers is feasible because projects, by their nature, have a beginning and an end; a focus and a result.

" 'The remaining question is the appropriate amount, if any for the adjustment. * * * [The] statements of current benefits submitted by PNB frequently are vague regarding the nature of the benefits and do not allow the Commissioner to determine the percentage of the expenditure that should be allocated to current ratepayers. PNB should work with staff to develop a reporting format that will allow allocations to be made with a minimum of staff review.'

"Although Order No. 87-406 was affirmed on reconsideration, the newly created Public Utility Commission recognized that better means might be devised to treat Bellcore costs. Order No. 87-802 provides:

" 'The Commission recognizes that there may be problems allocating some project costs to specific services. Those problems are inherent in the nature of Bellcore projects and will have to be addressed on a case-by-case basis as they arise. * * * The policy adopted here is intended to achieve a fair

matching of research expense with research benefits. Future review may disclose better methods to achieve that goal.'

"Staff does not deny that PNB derives significant benefits from participating in Bellcore projects. Nor does it claim that amounts spent by PNB on Bellcore activities are unreasonable. Rather, it argues that PNB has failed to quantify current ratepayer benefits as required in Order Nos. 87-406 and 87-802. Without such a showing, staff argues that there is no way to insure that Bellcore costs are fairly allocated between present and future customers.

"In addition, staff reiterates the concern in Orders Nos. 87-406 and 87-802 that current ratepayers not be charged for research and development efforts intended to benefit deregulated services. Staff asserts that the disputed projects exhibit a future network orientation and will likely benefit future services or services that are deregulated before the project outputs become available. It contends that 'the beneficiaries of future-oriented asset utilization may be obscured' as the telecommunications industry moves toward an environment which contain[s] deregulated and flexibly regulated services.

"In response, PNB argues that the policy established in Docket UT 43 is inconsistent with fundamental principles of regulation and is unworkable from a ratemaking standpoint. It maintains that the task of allocating project benefits between current and future ratepayers is impossible because many R&D activities do not yield discrete outputs that may be quantified at a given point in time. For example, projects involving software development and applied research may not produce quantifiable benefits in a given year even though important advances have been made. PNB urges the Commission to abandon the policy established in Order Nos. 87-406 and 87-802 and determine the recoverability of Bellcore costs based on whether the expenditures are reasonable and prudent.

"\* \* \* \* \*

"PNB produced testimony from eleven witnesses who described ratepayer benefits resulting from participation in Bellcore activities. As part of that showing, PNB quantified current benefits in terms of 'cost avoidance' and 'implemented output.' According to PNB, 'cost avoidance' benefits are those which result from participation in Bellcore as opposed to performing the activity on a stand-alone basis. 'Implemented output,' on the other hand, refers to savings or revenue generated from implementing a Bellcore project.

The witnesses testified that all 115 of the disputed projects provide current benefits from a cost avoidance standpoint, while 65 of the projects provide identifiable output useful to PNB's present operations. Current benefits from these sources were estimated at $21,316,028 and $11,124,000, respectively.

"Although staff recognizes that Bellcore provides valuable functions for PNB, it places little weight on the cost avoidance benefits calculated by the company. It stresses that the ability to avoid stand-alone costs by participating in Bellcore does not prove that ratepayers will receive any useful benefit from the projects themselves. *The Commission agrees that estimates of cost avoidance have limited value absent a showing that the project(s) are in furtherance of the utility's public service obligation. In PNB's case, that obligation encompasses not only the design and maintenance of the existing system, but also planning, engineering and other technological efforts necessary to insure the future enhancement of the telecommunications network.*

"\* \* \* \* \*

"Based on the record in this proceeding, *the Commission is uncertain whether the policy articulated in Docket UT 43 can be applied in a manner that is in the best interests of PNB's ratepayers. While the notion of allocating R&D costs between current and future customers has obvious merit from a ratemaking standpoint, we question whether the necessary separation of benefits can be accomplished without jeopardizing research and development projects essential to PNB's regulated service obligation. This case demonstrates that many research and development activities simply do not lend themselves to the quantification contemplated by Orders Nos. 87-406 and 87-802.*

"Under the circumstances, the Commission finds that the staff recommendation to disallow Bellcore costs should not be adopted. The record is sufficient to support the finding that the Bellcore expenditures made by PNB are *reasonably related to the performance of its utility function and should be approved.*" (Emphasis supplied.)

█  URP's position on review can be summarized briefly: Research and development costs must be shown to be of benefit to ratepayers; PNB bears the burden in this proceeding to prove that Bellcore costs are of benefit to ratepayers; PUC erred in failing to apply the "benefit to ratepayers" test

and in placing the burden of proof on staff rather than on PNB.

*Pacific Northwest Bell v. Davis*, 43 Or App 999, 608 P2d 547 (1979), on which URP relies, does not establish the premise that "benefit to ratepayers" is the only correct way in which to test the acceptability of utility expenditures. In that case, we considered challenges to the validity of an agency rule, called a "guideline," that provided that utility advertising expenses in excess of one-half of one percent of net operating income would be presumed excessive unless the agency could show that "its expenditures have benefitted or were reasonably intended to benefit its ratepayers." 43 Or App at 1011. On the face of a contention by PNB that the guideline substituted the "benefit to ratepayers" test for the statutory requirement that rates be "just and reasonable," we held that there was no conflict, and that it was within the agency's authority to establish such a rule for the evaluation of certain types of advertising expenses. 43 Or App at 1014.

Contrary to URP's contention, our decision in *Pacific Northwest Bell* approving the validity of the agency's rule did not establish a substantive requirement that all utility expenses provide a direct benefit to the ratepayer. We held only that the rule did not conflict with the standard set forth in the statute and that it was within the agency's authority to adopt it.

As apparent from PUC's order in this case, two prior agency orders relating to PNB have involved the evaluation of Bellcore expenses, Orders 87-406 and 87-802. In the more recent Order 87-802, PUC established a policy for the allocation of Bellcore expenses:

> "The Commission recognizes that there may be problems allocating some project costs to specific services. Those problems are inherent in the nature of Bellcore projects and will have to be addressed on a case-by-case basis as they arise. * * * *The policy adopted here is intended to achieve a fair matching of research expense with research benefits.* Future review may disclose better methods to achieve that goal." (Emphasis supplied.)

In this proceeding, PUC continues to grapple with the extent to which it is possible to achieve a "fair matching" of research expenses with research benefits to ratepayers. PUC's order

refers to evidence presented by PNB concerning ratepayer benefit and implicitly acknowledges that the projects at issue benefit ratepayers to the extent that they satisfy PNB's public service obligation, which includes efforts necessary to insure the future enhancement of the telecommunications network. Staff's and PUC's concern was primarily with the *allocation* of benefit among present and future ratepayers and future deregulated or unregulated service. PUC implicitly accepted PNB's view that allocation of research and development costs is not a viable method for determining the allowability of PNB's Bellcore costs. PUC found, instead, that PNB's Bellcore expenses were "reasonably related" to PNB's utility function and concluded on that basis that they should be allowed. In this sense, we understand PUC to have rejected the prior standard of allocation of direct benefit as a method for evaluating research and development and having adopted a new standard of "reasonable relationship" to the utility function.

In our review of PUC's decision, we are mindful that the regulation of utility rates is a legislative function. *Valley & Siletz R.R. Co. v. Flagg*, 195 Or 683, 247 P2d 639 (1952). It is the end result of PUC's order that must be tested for validity, not the processes by which the agency reached that result. *Id.* at 699. PUC was not obligated to use any single formula or combination of formulas to determine what are, in each case, just and reasonable rates. *Pacific N. W. Bell v. Sabin*, 21 Or App 200, 224, 534 P2d 984, *rev den* (1975). Here, the record supports PUC's finding that the contested Bellcore expenses are reasonably related to PNB's utility function. Additionally, we conclude that it was permissible for PUC to approve the expenses based on its determination that they are "reasonably related" to PNB's utility function and that that standard does not conflict with PUC's duty, under ORS 759.035, to determine whether PNB's charges for services rendered are "just and reasonable." *See Pacific Northwest Bell v. Davis* (agency acted within scope of its authority in adopting "benefit to ratepayers" standard for evaluating utility's advertising expenses). In light of our conclusions that the agency's standard of reasonable relationship is permitted by the statute and is supported by substantial evidence, we need not address URP's argument that PUC erroneously placed the burden of proof on staff, rather than

on PNB, to show that its expenses provided a direct, allocable benefit to ratepayers.

■ ORS 759.285 provides that utility companies shall not receive rates that are derived from a rate base that includes "any construction * * * or real or personal property not presently used for providing utility service to the customer." URP contends that that statute prohibits including in PNB's revenue requirement expenses for Bellcore projects that do not presently provide utility service. We accept PUC's view that the focus of the statute is on expenditures for capital items and that it has nothing to do with expenses for research and development.

■ PUC disallowed PNB's expenses associated with PNB's research affiliate, Advanced Technologies (AT), because PNB had not filed with PUC a copy of its contract with AT as required by ORS 759.390. It is undisputed that some of PNB's Bellcore expenses were billed to PNB through AT. Because PUC allowed PNB's Bellcore expenses, it excluded the Bellcore expenses from the AT disallowance. We agree with PUC and PNB that there was no error in that calculation.

We conclude that CUB and URP have failed to establish that PUC's order is unreasonable or unlawful or not supported by substantial evidence.

Affirmed.